**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

WILLIE MACON,

Plaintiff,

vs. CASE NO.:

SAVORY THAI, LLC
Florida Limited Liability Company
d/b/a SAVORY THAI

INJUNCTIVE RELIEF SOUGHT

Defendant(s).

# COMPLAINT

Plaintiff, WILLIE MACON (hereinafter "MACON"), by and through the undersigned counsel, hereby files this Complaint and sues SAVORY THAI, LLC, Florida Limited Liability Company, d/b/a SAVORY THAI ("Defendant"), for declaratory and injunctive relief pursuant to 28 U.S.C. §§2201 and 2202, attorneys' fees, litigation expenses, costs (including, but not limited to, court costs and expert fees) for unlawful disability discrimination pursuant to Title III of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12181-12189 ("ADA"), and the regulations implementing the ADA set forth in 28 C.F.R. Part 36, et seq, and alleges as follows:

1. This action arises from Defendant's failure to make Defendant's online platform located at www.savorythailakeland.com (hereinafter "Defendant's Website") compatible with screen access software, thereby denying blind individuals, including MACON, full and equal access to Defendant's products and services.

2. MACON files this lawsuit because Defendant's policies exclude him, and millions of other potential consumers, from fully and equally enjoying Defendant's products and services.

3. Accordingly, MACON seeks an order requiring that Defendant make Defendant's Website accessible and adopt sufficient policies and practices to ensure the Defendant's Website does not become inaccessible again in the future.

## JURISDICTION AND VENUE

4. This Court is vested with original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and to 28 U.S.C. §1343 for Plaintiff's claims arising under Title 42 U.S.C. §§ 12181-12189, based on Defendant's violations of Title III of the ADA. See also 28 U.S.C. §§ 2201, 2202, as well as the 2010 ADA Standards.

5. Venue is proper in this Court, Tampa Division, pursuant to 28 U.S.C. § 1391(b) and Internal Operating Procedures for the United States District Court of the Middle District of Florida in that a substantial part of the acts and omissions giving rise to MACON's claims occurred in Polk County, Florida.

6. Defendant attempts to and indeed does, participate in Polk County's economic life by offering and providing products and services over the internet to Polk County's residents, but also extends its services to other residents within the state of Florida through its online presence, including MACON, who is a resident of Orange County, Florida. Defendant purposefully avails itself of the benefits and advantages of operating an interactive, online business open 24-hours a day, 7-days a week, 365-days a year to Florida residents. Indeed, upon information and belief, Defendant places cookies on computers and other electronic devices physically located throughout Florida every time a Florida resident visits Defendant's Website.

7. Further, Defendant operates a Principal Place of Business with a physical address of 5109 US Hwy 98 S, Lakeland, FL 33812 (hereinafter "Defendant's Principal Place of Business"), which is located in Polk County, Florida.

8. MACON was injured when he attempted to access Defendant's Website and encountered communication barriers that denied him full and equal access to Defendant's online products, content, services, and other information that Defendant is interested in communicating/offering to its customers.

## PARTIES

9. MACON is a natural person over the age of 18 and is blind.

10. MACON is *sui juris* and is a resident of the State of Florida residing in Orlando, Florida, located in Orange County.

11. MACON is disabled as defined by the ADA and is therefore a member of a protected class under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 et seq. More specifically, MACON is legally blind from Traction Retinal Detachment, Neovascular Glaucoma, and other ocular complications caused by Diabetes Type I, and therefore is substantially limited in performing one or more major life activities, including but not limited to accurately visualizing his world. As a result of his visual impairment, MACON uses screen access software to access digital content, like text messages, emails, and websites.

12. MACON cannot use his computer without the assistance of appropriate and available auxiliary aids, screen reader software, and other technology and assistance. Screen reader software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user. As explained in the Eastern District of New York holding of *Andrews v. Blick Art Materials, LLC*:

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be 'clicked,' which will bring him to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an

> arrow symbol to a hand. The screen reading software uses auditory -- rather than visual -- cues to relay this same information. When a sight impaired individual reaches a link that may be 'clicked on,' the software reads the link to the user, and after reading the text of the link says the word 'clickable.'...Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with his keyboard.

*Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y.2017).

13. MACON's blindness limits him in the performance of major life activities, including sight, and he requires assistive technologies, auxiliary aids, and services for effective communication, including communication in connection with his use of a computer.

14. MACON frequently accesses the internet. Due to blindness, to effectively communicate and comprehend information available on the internet and thereby access and comprehend websites, MACON uses commercially available screen reader software to interface with the various websites.

15. Defendant is a Florida Limited Liability Company with a principal place of business of 5109 US Hwy 98 S, Lakeland, FL 33812 (hereinafter "Defendant's Principal Place of Business").

16. Defendant operates a restaurant under the name Savory Thai at Defendant's Principal Place of Business. Defendant provides food and beverages to the public, including soups, noodle dishes, curries, fried rice, wings, and Thai tea. Defendant operates Defendant's Website, through which consumers can review its

menu, access pickup and delivery ordering links, and obtain information about its physical location and hours.

17. Defendant owns, operates, maintains, and/or controls Defendant's Website and is responsible for the policies, practices, and procedures concerning Defendant's Website development and maintenance.

18. Defendant's Principal Place of Business is also open to the public. As such, it is a Place of Public Accommodation subject to the requirements of Title III of the ADA and its implementing regulations as defined by 42 U.S.C. §12181(7)(B), §12182, and 28 C.F.R. §36.104(2). Defendant's Principal Place of Business is also referenced as a "place of public accommodation."

19. Defendant operates its restaurant from its Principal Place of Business in Lakeland, Florida, and maintains Defendant's Website as a digital extension of that physical establishment. Defendant's Website is accessible to consumers nationwide and provides information about goods and services offered at Defendant's physical location. Through Defendant's Website, consumers can review dishes and prices, access PDF menus, use links for pickup and delivery ordering, and obtain Defendant's address, hours, and telephone number. Defendant's Website is operated in connection with Defendant's Principal Place of Business.

20. At all times material hereto, Defendant was and still is an organization owning, operating, and/or controlling Defendant's Website. Since Defendant's

Website is open to the public through the internet, by this nexus Defendant's Website is an intangible service, privilege, and advantage of Defendant's Principal Place of Business that must comply with all requirements of the ADA, must not discriminate against individuals with visual disabilities, and must not deny those individuals the same full and equal access to and enjoyment of the goods, services, privileges, and advantages as are afforded the non-visually disabled public both online and in the Principal Place of Business. As such, Defendant has subjected itself and Defendant's Website to the requirements of the ADA.

**FACTUAL AND SUBSTANTIVE ALLEGATIONS**

21. MACON is and has been a customer who is interested in patronizing and intends to patronize in the near future, once Defendant's Website's access barriers are removed or remedied, Defendant's Principal Place of Business.

22. During MACON's Website Visits, MACON attempted to use Defendant's Website to review Defendant's menu and prices, select food and beverages, and access pickup or delivery ordering for Defendant's physical restaurant, the same functions available to non-disabled customers. The inaccessible PDF menu prevented independent review of its contents with his screen reader, the Close Search control could not be reached or activated by keyboard, preventing him from exiting the search panel without a mouse. Defendant's failure to make these functions accessible to MACON's screen reader software denied MACON the same

access to Defendant's goods that Defendant's Website provides to non-disabled customers.

23. Defendant's Website is additionally used to search for brick-and-mortar locations, check Defendant's hours, pricing, offerings, and sign up for electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use at Defendant's Website or in Defendant's Principal Place of Business.

24. The opportunity to shop and pre-shop Defendant's offerings available for purchase at Defendant's Principal Place of Business and sign up for electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use at Defendant's Principal Place of Business from his home are important accommodations for MACON because traveling outside of his home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating and confusing experience. These online functions directly affect MACON's in-store experience, such that they are tied to and provide a benefit to MACON. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually impaired individuals using the screen reader software.

25. Like many consumers, MACON accesses numerous websites at a time to compare offerings, prices, sales, discounts, events, and promotions. MACON may view several dozen websites to compare features, discounts, promotions, and prices.

26. MACON utilizes screen reader software that allows individuals who are visually disabled to communicate with websites. However, Defendant's Website contains access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

27. On or about the following dates, MACON attempted to utilize Defendant's Website:

a. July 28, 2026;

b. August 07, 2026;

c. August 22, 2026;

d. September 07, 2026; and

e. September 26, 2026.

(hereinafter "MACON's Website Visits"). During MACON's Website Visits, MACON experienced substantial access barriers and, thus, was denied fair and equal access to same. MACON was attempting to browse the offerings and online offers to educate himself as to the offerings, sales, discounts, and promotions being offered, and with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

28. While notice to Defendant is not required, MACON sent a pre-suit communication on August 7, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

29. Prior to initiating suit, but following the sending of the pre-suit communications, MACON has continued to attempt to utilize Defendant's Website during MACON's Website Visits to browse and educate himself as to the offerings, sales, discounts, and online promotions, with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

30. However, Defendant's Website continues to contain access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

## VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT

31. MACON adopts and re-alleges the allegations stated in paragraphs 1 through 30 above as if fully stated herein.

32. On July 26, 1990, Congress enacted the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. Commercial enterprises were provided one and a half (1.5) years from the enactment of the statute to implement its requirements. The effective date of Title III of the ADA was January 26, 1992, or January 26, 1993, if Defendant(s) have ten (10) or fewer employees and gross receipts of $500,000.00 or less. *See* 42 U.S.C. § 12182; 28 C.F.R. § 36.508(a).

33. Congress found, among other things, that:

a. some 43,000,000 Americans have one or more physical or mental disabilities, and this number shall increase as the population continues to grow older;

b. historically, society has tended to isolate and segregate individuals with disabilities and, despite some improvements, such forms of discrimination against disabled individuals continue to be a pervasive social problem, requiring serious attention;

c. discrimination against disabled individuals persists in such critical areas as employment, housing, public accommodations, transportation, communication, recreation, institutionalization, health services, voting and access to public services and public facilities;

d. individuals with disabilities continually suffer forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, benefits, or other opportunities; and,

e. the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the

opportunity to compete on an equal basis and to pursue those opportunities for which our country is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and non-productivity.

42 U.S.C. § 12101(a)(1)-(3),(5) and (9).

34. Congress explicitly stated that the purpose of the ADA was to:

a. provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

b. provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; and

c. invoke the sweep of congressional authority, including the power to enforce the Fourteenth Amendment and to regulate commerce, in order to address the major areas of discrimination faced on a daily basis by people with disabilities.

42 U.S.C. § 12101(b)(1)(2) and (4).

35. Section 302(a) of Title III of the ADA, 42 U.S.C. § 12101 et seq., provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation by any person who owns,

leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

36. "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination. . . . The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the inability to choose. . . . However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[1]

37. More than thirty years "after the passage of the ADA, numerous facilities are still not compliant, leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[2] and private individuals[3] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[4]

---

[1] Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (citing H.R. REP. No. 101-485, pt. 2, at 28-29 (1990); Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002) (arguing for a more lenient standard for standing under the ADA); and Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006) (discussing the need for private enforcement in Title III)).

[2] 42 U.S.C. § 12188(b).

[3] 42 U.S.C. § 12188(a).

[4] Johnson, *supra* note 8.

38. Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[5] most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled."[6]

39. The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that because it "cannot investigate every place of public accommodation," "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[7]

40. Consistent with these policies, MACON files this case to ensure Defendant provides full and equal access to the goods and services that Defendant offers to the public from Defendant's Principal Place of Business and/or physical facilities.

41. Defendant's Principal Place of Business and Defendant's Website are public accommodations within the definition of Title III of the ADA, 42 U.S.C. § 12181(7).

---

[5] *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).

[6] *Id.* (*quoting Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)); *D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1040 (9th Cir. 2008).

[7] Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

42. There is a physical nexus between Defendant's Website and Defendant's Principal Place of Business in that Defendant's Website provides contact information, the physical address, operating hours, and access to goods and services offered at Defendant's Principal Place of Business. Defendant's Website acts as the digital extension of Defendant's Principal Place of Business. The opportunity to shop and pre-shop Defendant's food and beverage offerings, review menu items and prices, and access pickup or delivery ordering through Defendant's Website from home are important accommodations for MACON because traveling outside of his home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating, and confusing experience. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually impaired individuals using screen reader software.

43. Public accommodations under the ADA must ensure that their places of public accommodation provide effective communication for all members of the general public, including individuals with visual disabilities such as Plaintiff.

44. The broad mandate of the ADA is to provide equal opportunity for individuals with disabilities to participate in and benefit from all aspects of American civic and economic life. That mandate extends to internet e-commerce websites such as the Defendant's Website.

45. Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i).

46. Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations, which is equal to the opportunities afforded to other individuals. 42 U.S.C. §12182(b)(1)(A)(ii).

47. Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, among other things: “a failure to make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the

good, service, facility, privilege, advantage or accommodation being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii); see also 28 C.F.R. § 36.303(a).

48. According to 28 C.F.R. §36.303(b)(1), auxiliary aids and services include "voice, text, and video-based telecommunications products and systems". Indeed, 28 C.F.R. §36.303(b)(2) specifically states that screen reader software is an effective method of making visually delivered material available to individuals who are blind or have low vision.

49. Title III requires that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). The regulation sets forth numerous examples of "auxiliary aids and services," including "...accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision." 28 C.F.R. § 36.303(b). The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder. MACON, who is blind and has disabilities that substantially limit the major life activity of seeing within the meaning of 42 U.S.C. §§ 12102(1)(A) and (2)(A), has been denied full and equal access to Defendant's Website because of his disability. He has not been provided services that are provided to other patrons who are not disabled, and/or has

been provided services that are inferior to the services provided to non-disabled persons. Defendant has failed to take the required prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

50. MACON encountered barriers on each of MACON's Website Visits. MACON attempted to access and/or utilize Defendant's Website, but was unable to, and he continues to be unable to enjoy full and equal access to Defendant's Website and/or understand the content therein because numerous portions of Defendant's Website do not interface with MACON's screen reader software. Specifically, features of Defendant's Website are inaccessible to MACON's screen reader software, including, but not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines and Conformance Levels):

**a. Award badges have multiple separate links**

i. **Issue:** The 2023 Best New Restaurant and Savoury Thai Restaurant Guru 2023 badge appears as a single visual award; however, the underlying code applies separate links to different portions of the same badge. One link is assigned to "Savory Thai" and another to "by Restaurantji," making it impossible for users to determine which part constitutes the intended link or where each link will navigate.




ii. **WCAG 2.1 AA Violations:** 2.4.4 - A, 1.3.1 - A - Link Purpose In Context

iii. **Impact:** For users who are blind and rely on screen readers, encountering multiple separate links within what appears to be a single badge creates significant confusion and disorientation. Because each portion of the badge is coded as a distinct link with no clear or unified purpose, blind users navigating by links alone cannot determine which link is meaningful, where it leads, or how the two links relate to one another. The entire badge must function as a single, clearly labelled link whose accessible name describes the full purpose of the award. All visual and textual elements of the badge must belong to that one link, and no portion of the badge should carry its own separate link destination.

**b. Missing New Window Indication for Award Badge Links**

i. **Issue:** The award badge links open in a new browser window or tab without providing any prior notification of this behavior to users before they activate the link. Screen reader users and keyboard-only users receive no indication that a new window has been launched, which may cause them to believe they remain on the same page and to be unable to understand why the browser's Back button no longer returns them to the previous content.




ii. **WCAG 2.1 AA Violations:** 2.4.4 -A, 3.2.2 - A - Link Purpose In Context

iii. **Impact:** For users who are blind and navigate exclusively through screen readers, the absence of any warning that a link will open in a new browser window or tab creates a deeply disorienting experience. When a new window opens without notice, blind users may lose their place entirely, become

confused about the change in browsing context, and be unable to return to the previous page using the Back button. Notification of new window behavior must be conveyed before the link is activated, either through visible link text or a properly exposed accessible name, so that all users — including those who are blind — can make an informed decision before selecting the link.

c. **Non-Descriptive "View PDF", "Pickup", and "Delivery" Links**

i. **Issue:** The page contains links labelled "View PDF," "Pickup," and "Delivery" that fail to clearly describe their purpose when read in isolation. Screen reader users frequently navigate pages using a links list, in which only the link text is announced without surrounding context. Because these link labels do not convey sufficient information about their destination or intended action, users are unable to determine where each link leads or what it will do without reading the surrounding page content, creating a significant barrier for those who rely on assistive technologies to navigate efficiently.




ii. **WCAG 2.1 AA Violations:** 2.4.4 - A - Link Purpose In Context

iii. **Impact:** For users who are blind and depend on screen readers to navigate, non-descriptive link text such as "View PDF," "Pickup," and "Delivery" renders independent and efficient navigation effectively impossible. When accessing a links list, a blind user hears only the link label with no surrounding context to clarify the link's purpose or destination. This forces the user to navigate away from the links list and read surrounding content in an attempt to interpret each link — a time-consuming and often unsuccessful process. Every link on the page must include descriptive text that clearly identifies its destination or action so that blind users can navigate with confidence and complete their intended tasks without unnecessary difficulty.

**d. Incorrect Alternative Text for Social Media Links**

i. **Issue:** The social media links are coded with alternative text that does not accurately reflect the purpose or destination of each respective link. Screen reader users rely on alternative text to identify which social media platform a link will open; when that text is incorrect or unrelated to the actual destination, users are unable to determine the correct link before activating it, creating an accessibility barrier that prevents informed navigation.




ii. **WCAG 2.1 AA Violations:** 1.1.1 - A, 2.4.4 - A - Non Text Content

iii. **Impact:** For users who are blind and navigate using screen readers, incorrect alternative text on social media links makes it impossible to identify the correct platform or destination before activating a link. Because blind users

cannot see the visual icon associated with each link, they depend entirely on the alternative text or accessible name to understand where the link leads. When that text is inaccurate or misleading, blind users may activate the wrong link, arrive at an unintended destination, and be unable to complete their intended task. Each social media link must carry alternative text or an accessible name that correctly and unambiguously identifies the platform, ensuring that blind users can navigate social media links with the same accuracy and confidence as sighted users.

**e. Missing New Window Indication for Social Media Links**

i. **Issue:** The social media links open in a new browser window or tab without communicating this behavior to screen reader users prior to activation. Users generally expect a link to open within the same browsing window unless they are informed otherwise in advance. Without this notification, screen reader users cannot anticipate the change in browsing context, making it impossible for them to understand that a new window has opened or to navigate back to the previous page using the Back button.




ii. **WCAG 2.1 AA Violations:** 2.4.4 -A, 3.2.2 - A - Link Purpose In Context

iii. **Impact:** For users who are blind and rely on screen readers, the absence of any prior warning that a social media link will open in a new browser window or tab causes significant disorientation and loss of navigational control. When a new window opens unexpectedly, a blind user may be unable to determine that the browsing context has changed, may lose their place within the page, and may find it impossible to return to the previous content using the Back button. All links that open in a new window or tab must clearly communicate this behavior before the user activates the link, through either visible link text or a properly exposed accessible name, so that blind users and all other users can make a fully informed decision prior to selecting the link.

**f. Focus Is Not Trapped Within the Search Panel**

i. **Issue:** Upon activating the Search button, the search panel is displayed; however, keyboard focus is not confined within the panel during Tab key navigation. Instead, focus traverses to interactive elements located behind the search panel, allowing keyboard and screen reader users to inadvertently interact with background content while the panel remains open. This failure presents a critical barrier, as users are unable to remain within the active panel context and may lose track of their current interaction.




ii. **WCAG 2.1 AA Violations:** 2.4.3 - A - Focus Order

iii. **Impact:** For users who are blind and rely exclusively on a screen reader and keyboard navigation, the absence of a focus trap within the search panel creates a severely disorienting experience. When focus escapes the panel and

moves to background content, blind users lose their place within the interface and have no reliable means of determining where they are or how to return to the active panel. This makes it effectively impossible for them to complete a search task independently. The expected behavior requires that upon opening the search panel, keyboard focus moves immediately to the first interactive element within the panel; that Tab and Shift+Tab navigation cycles only through elements inside the panel until it is dismissed; that background content remains inaccessible while the panel is active; and that upon closing the panel, focus is returned to the Search button that originally triggered it.

**g. Missing Keyboard Support for the Close Search Button**

i. **Issue:** The Close Search button is inaccessible via keyboard navigation and cannot be reached or activated without the use of a mouse. Screen reader users are additionally unable to access or identify the button, as keyboard focus does not move to it and it is not correctly exposed within the accessibility tree. Consequently, users who depend solely on a keyboard or assistive technology are entirely unable to

dismiss the search panel, creating an insurmountable barrier to completing or exiting the search interaction.




ii. **WCAG 2.1 AA Violations:** 2.1.1 - A, 4.1.2 - A - Keyboard

iii. **Impact:** For users who are blind and navigate exclusively through a keyboard and screen reader, the inability to reach or activate the Close Search button renders the search panel effectively unescapable without mouse interaction. Blind users have no means of independently dismissing the panel, which traps them within an incomplete interaction and prevents them from continuing to use the page. This represents a fundamental denial of access, as the user cannot exit the search experience or return to normal page navigation without assistance. All interactive controls, including the Close Search button, must be fully operable via

keyboard and correctly exposed to assistive technologies to ensure equitable access for users with visual disabilities.

**h. Incorrect Role Used for Close Search Button**

i. **Issue:** The Close Search button has been assigned the link role rather than the appropriate button role. Because the control performs an action rather than navigating to a new page or resource, the use of the link role is semantically incorrect and misleading. Screen reader users will hear the control announced as a link, which creates an inconsistent and confusing experience that does not accurately reflect the control's intended functionality. For users who depend on assistive technologies, this misrepresentation makes it impossible to clearly understand how the control should be operated.




ii. **WCAG 2.1 AA Violations:** 4.1.2 - A - Name Role Value

iii. **Impact:** For users who are blind and rely on screen readers to interpret and interact with interface controls, hearing the Close Search control announced as a link rather than a button introduces significant confusion. Blind users form their understanding of a control's purpose based on its announced role; a link is expected to navigate to a destination, whereas a button is expected to trigger an action. This mismatch causes blind users to misunderstand how the control functions, potentially preventing them from activating it correctly or recognizing it as the means to close the panel. The control must be assigned the button role, exposed with an accessible name such as "Close Search," and be activatable using both the Enter and Space keys so that its announced role accurately reflects its functionality.

**i. Decorative Images Are Exposed to Screen Readers in Browse Mode**

i. **Issue:** Decorative images on the page are not hidden from assistive technologies and are therefore exposed to screen readers during browse mode navigation, despite conveying no meaningful information and serving no functional

purpose. As users navigate the page, these images are announced unnecessarily, introducing extraneous content into the reading experience. This creates a significant barrier for screen reader users, who are unable to focus exclusively on meaningful content because they must navigate through announcements that should have been suppressed from the accessibility tree.




ii. **WCAG 2.1 AA Violations:** 1.1.1 - A - Non Text Content

iii. **Impact:** For users who are blind and navigate pages using a screen reader in browse mode, the unnecessary announcement of decorative images significantly disrupts the reading experience. Each decorative image that is incorrectly exposed forces blind users to process and dismiss irrelevant information, increasing cognitive load and making it substantially more difficult to identify and access

meaningful content. In pages with multiple decorative images, this issue compounds, causing blind users to lose their place, miss important content, or become fatigued navigating through noise. Decorative images must be hidden from the accessibility tree so that blind users can move through the page efficiently, hearing only content that is purposeful and informative.

### j. Multiple H1 Headings Defined on the Page

i. **Issue:** The page contains more than one instance of an heading element, which undermines the clarity and integrity of the page's structural hierarchy. A single heading is intended to identify the primary purpose of the page; the presence of multiple elements makes it impossible for screen reader users to determine the page's main topic with confidence. Screen reader users frequently rely on heading navigation to understand page structure and move efficiently between sections. When the heading hierarchy is improperly defined, users cannot form an accurate mental model of the page, and the logical structure necessary for accessible navigation is absent. The page must contain one clearly

defined heading, with subsequent content organized under , , and further heading levels in a properly ordered hierarchy.




ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users who are blind and rely on screen readers to navigate page content through heading structure, the presence of multiple headings creates serious confusion about the page's primary purpose and overall organization. Blind users depend on a clear and logical heading hierarchy to orient themselves, understand the relationship between sections, and move efficiently through content without reading every element sequentially. When multiple headings exist, blind users cannot reliably identify the main topic of the page, and the structural cues they depend on for navigation become misleading and unreliable. This forces

blind users to expend significantly greater effort to comprehend page content and may cause them to miss important information entirely. Each page must contain only one heading that describes its primary purpose, with all subsequent headings using , , , and further levels in a logical, unbroken order that accurately reflects the content hierarchy.

**k. Incorrect Heading Level Used for Dishes Section Headings**

i. **Issue:** Dishes section headings, including "Savory Wings (6)," "Pad See Ew," "Tom Yum Soup," and similar items, are incorrectly marked as H4 rather than H3. As direct child sections under the preceding heading level, these headings must follow the correct hierarchical order without skipping levels. Improper heading levels produce an inaccurate page outline, preventing users from understanding how sections relate to one another and making it impossible to navigate content in a meaningful sequence.




ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users who are blind or have visual disabilities and rely on screen readers to navigate by headings, the incorrect use of H4 instead of H3 for dishes section headings such as "Savory Wings (6)," "Pad See Ew," and "Tom Yum Soup" produces a misleading and disorganized page outline. The skipped heading level obscures the structural relationship between sections, making it impossible for these users to accurately interpret the content hierarchy or move between sections in a logical and meaningful order. The dishes section headings should use the correct heading level based on the overall page structure, with direct child sections marked as H3 rather than H4, following a logical sequence without skipping levels, so that screen reader users can fully

understand the page layout and navigate between sections with ease and confidence.

**l. PDF Does Not Contain a Tag Structure**

i. **Issue:** The "Savory Thai Trifold PDF" lacks the proper tag structure required for accessibility. The content is either untagged or incorrectly tagged, resulting in a missing or inaccurate reading order. Images and text within the PDF are not properly labeled, preventing users from understanding the information presented. This absence of semantic structure makes it impossible for users who rely on assistive technologies to read and interact with the menu content independently.




ii. **WCAG 2.1 AA Violations:** 1.3.1- A, 1.1.1 - A, 2.4.3 - A, 1.3.2 - A, 4.1.2 - A - Pdf

iii. **Impact:** For users who are blind or have visual disabilities and depend on screen readers, the absence of a proper tag structure in the "Savory Thai Trifold PDF" renders the document entirely inaccessible. Without semantic tags, the screen reader cannot determine a logical reading order, interpret the document's structure, or convey the meaning of images and text to the user. This effectively denies blind users independent access to the menu content. The PDF must be authored with proper semantic tags so that headings, lists, and sections are clearly identified, all images carry meaningful alternative text, and the reading order follows a clear and logical sequence, enabling users to navigate and understand the document fully and without confusion.

51. Defendant's Website was subsequently visited by Plaintiff's expert, Till Paris, on or about August 1, 2026, and who confirmed the access barriers that MACON had initially encountered did, in fact, exist. The numerous access barriers found on Defendant's Website by Plaintiff's Expert are set forth in the Declaration of Till Paris, attached hereto as "Composite Exhibit 1". The contents of "Composite Exhibit 1" are incorporated herein by reference. These access barriers continue to

render Defendant's Website inaccessible to users who are blind and visually disabled, including MACON.

52. More violations may be present on Defendant's Website, which can and will be determined and proven through the discovery process in this case.

53. There are readily available, well-established guidelines on the internet for making websites accessible to the blind and visually disabled. These guidelines have been followed by other large business entities in making their websites accessible. Incorporating such basic components to make the Defendant's Website accessible would neither fundamentally alter the nature of Defendant's business nor would it result in an undue burden to the Defendant.

54. Defendant thus has failed to make reasonable modifications in its policies, practices, or procedures when such modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, in violation of 28 C.F.R. §36.302.

55. To the best of Plaintiff's belief and knowledge, Defendant has failed to eliminate the specific violations set forth in paragraph 50 and 51 herein. As a result, Defendant has violated the ADA -- and continues to violate the ADA -- by denying access to Defendant's Website by individuals, such as MACON, with visual disabilities who require the assistance of interface with screen reader software to

comprehend and access internet websites. These violations within the Defendant's Website are ongoing.

56. Although Defendant is charged with having knowledge of the violations, Defendant may not have actual knowledge of said violations until this Complaint makes Defendant aware of same.

57. Here, however, MACON, through counsel, did send a pre-suit communication informing Defendant of the barriers to access on August 7, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

58. As a direct and proximate result of Defendant's failure to provide an ADA compliant Website, with a nexus to Defendant's Principal Place of Business, Plaintiff has suffered an injury in fact by being denied full access to and enjoyment of Defendant's Website and Defendant's Principal Place of Business.

59. Because of the inadequate development and administration of the Defendant's Website, MACON is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303, to remedy the ongoing disability discrimination.

60. Enforcement of MACON's rights under the ADA is right and just pursuant to 28 U.S.C. §§2201 and 2202.

61. MACON has retained the undersigned counsel for the pursuit, filing and prosecution of this action. MACON is entitled to have his reasonable attorneys'

fees, costs and expenses paid by Defendant, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505.

62. Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant MACON appropriate and necessary injunctive relief; including an order to:

a. Require Defendant to adopt and implement a web accessibility policy to make publicly available and directly link from the homepage of Defendant's Website to a statement as to the Defendant's policy to ensure persons with disabilities have full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations through Defendant's Website.

b. Require Defendant to take the necessary steps to make Defendant's Website readily accessible to and usable by visually disabled users, and during that time period prior to Defendant's Website's being readily accessible, to provide an alternative method for individuals with visual disabilities to access the information available on Defendant's Website until such time that the requisite modifications are made, and

c. Require Defendant to provide the appropriate auxiliary aids such that individuals with visual impairments will be able to effectively communicate with Defendant's Website for purposes of viewing and

locating Defendant's Principal Place of Business, and becoming informed of and purchasing Defendant's offerings online, and during that time period prior to Defendant's Website's being designed to permit individuals with visual disabilities to effectively communicate, to provide an alternative method for individuals with visual disabilities to effectively communicate for such goods and services made available to the general public through Defendant's Website.

WHEREFORE, MACON requests entry of judgment in his favor and against Defendant for the following relief:

A. A declaration that Defendant's Website is in violation of the ADA;

B. An Order requiring Defendant, by a date certain, to update Defendant's Website, and continue to monitor and update Defendant's Website on an ongoing basis, to remove barriers in order that individuals with visual disabilities can access, and continue to access, Defendant's Website and effectively communicate with Defendant's Website to the full extent required by Title III of the ADA;

C. An Order requiring Defendant, by a date certain, to clearly display the universal disabled logo within Defendant's Website, wherein the logo would lead to a page which would state Defendant's accessibility information, facts, policies, and accommodations. Such a clear display

of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of Defendant's Website;

D. An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to ensure compliance thereto;

E. An Order directing Defendant, by a date certain, to evaluate its policies, practices and procedures toward persons with disabilities, for such reasonable time to allow Defendant to undertake and complete corrective procedures to Defendant's Website;

F. An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for Defendant's Website to ensure effective communication for individuals who are visually disabled;

G. An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's Website to be fully accessible to the visually disabled;

H. An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all

employees who write or develop programs or code for, or who publish final content to, Defendant's Website on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

I. An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of Defendant's Website to identify any instances where Defendant's Website is no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility guidelines, and further directing Defendant to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review;

J. An Order directing Defendant, by a date certain, to make publicly available and directly link from Defendant's Website's homepage, a statement of Defendant's Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of Defendant's Website and shall accompany the public policy statement with an accessible means of submitting accessibility questions and problems;

K. An award to Plaintiff of his reasonable attorney's fees, costs, and expenses; and

L. Such other and further relief as the Court deems just and equitable.

**Certification Under Penalty of Perjury That Artificial Intelligence Was Used in the Preparation of This Filing**

I have reviewed the Standing Order Requiring Disclosure of the use of artificial intelligence. Artificial intelligence was used in the preparation of this filing in the following way: The firm's case-management software uses AI to populate documents with case-specific information from the firm's records, creating a preliminary draft. Before filing, the signing attorney independently verifies that information against the underlying records, makes any necessary revisions, and reviews and finalizes the document. This automated population process does not perform legal research or generate case citations. The attorney then continues working on the document, reviewing all initial entries, and finalizing it before filing. The Case Management Software input does not involve legal research or case citations. However, under penalty of perjury, I certify that before filing, I personally reviewed Rule 11 of the Federal Rules of Civil Procedure and I personally read every case. I understand that if a case upon which I rely does not exist or does not reasonably stand for the cited proposition, the Court may treat this as a violation of Rule 11 of the Federal Rules of Civil Procedure. I have reviewed Rule 11 of the Federal Rules of Civil Procedure and I understand that this rule applies equally to counsel and unrepresented parties, that as the person signing this filing I am the person who will be held responsible for its contents even if it was prepared by someone else, and I am familiar with the sanctions available for violations of Rule 11. If this certification is made by counsel, I further understand that citation to a case that either does not exist or does not reasonably stand for the cited proposition may be treated as a violation of my oath of candor toward the tribunal and a basis on which my admission to practice in the Middle District of Florida could be revoked or suspended. Further, whether I represent myself or I am an attorney representing a client, I understand that by making this certification under penalty of perjury I could be referred for criminal prosecution if the statements I make here are false.

Dated: October 12, 2026 Respectfully submitted,

**ADA LEGAL TEAM, LLC**
300 Avenue of the Champions, Suite 260
Palm Beach Gardens, FL 33418
Phone: (561) 227-9821

Facsimile: (561) 491-9459

By: **/s/ Gregory S. Sconzo**
GREGORY S. SCONZO, ESQUIRE
Florida Bar No.: 0105553
**DESIGNATED LEAD COUNSEL**
**Primary Email:** greg@sconzolawoffice.com
**Secondary Email**: greg@adalegalteam.com
**Secondary Email**: kevin@adalegalteam.com
**Attorney for Plaintiff**